ALW:ML
F.# 2006R02221

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

THOMAS W. QUALLS,

        Defendant.

- - - - - - - - - - - - - - - - X

**To Be Filed
Under Seal**

I N D I C T M E N T

Cr. No. _____
(T. 18, U.S.C., §§ 1341,
1343, 1349, 1512(c)(1),
1512(c)(2),
1956(a)(1)(A)(i),
1956(a)(2)(A),
1956(h), 1957(a),
1957(b), 2, 981(a)(1)(C),
982 and 3551 et seq.;
T. 21, U.S.C., § 853;
T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

      At all times relevant to this Indictment, unless
otherwise stated:

## INTRODUCTION

### I.  Background

      1.   International Foreign Currency, Inc. ("IFC") held
itself out as a firm that invested in the spot foreign exchange
market on behalf of investors.  On or about November 27, 2001,
IFC registered as a corporation in the State of New York.
Beginning in approximately January 2002, IFC maintained an office
at 990 Stewart Avenue, Garden City, New York (the "IFC Office").

      2.   Cold callers, brokers and others associated with
IFC solicited persons residing in Europe, Israel, Norway,
Belgium, Australia, the United States and other countries seeking

to invest in foreign currency trading.   IFC executives and employees engaged in a conspiracy and scheme to defraud by making false and fraudulent representations in order to induce investments with IFC.   These solicitations were conducted by means of interstate and international telephone communications and facsimiles, as well as through documents sent by United States mail and commercial interstate and foreign carrier. Investors solicited by IFC included one or more persons residing in the Eastern District of New York.

3.   IFC maintained a business checking account at a branch of JP Morgan Chase ("Chase") located in Long Beach, New York from approximately May 2001 through February 2003.   From approximately February through August 2003, IFC maintained a business checking account at a branch of the Bank of New York ("BONY") located in Garden City, New York.   IFC personnel directed investors to send funds by wire transfer to these accounts, first to Chase and subsequently to BONY (each referred to as the "Investor Account").

4.   The defendant THOMAS W. QUALLS resided at various times in Bellmore and Long Beach, New York.   QUALLS was a principal of IFC and served as its President and Treasurer.

5.   Prior to forming IFC, QUALLS was employed at Evergreen International Spot Trading, Inc. ("Evergreen"), a firm that also held itself out as one that invested in the spot

3

foreign exchange market on behalf of investors.  Employees of
Evergreen, including the defendant THOMAS W. QUALLS, used
deceptive and high-pressure sales tactics to solicit investors.
Evergreen employed QUALLS between approximately February 1998 and
February 1999.  In approximately October 2001, Evergreen ceased
operations, and the conduct of Evergreen's executives and
employees became the subject of federal investigations that
received media attention.

      6.    Between approximately 1999 and 2001, the defendant
THOMAS W. QUALLS, together with others, formed and operated
Oxford-Dundee, Inc. ("Oxford-Dundee"), located in Stamford,
Connecticut, another firm that held itself out as one that
invested in the spot foreign exchange market on behalf of
investors.  Under the supervision of QUALLS and others, Oxford-
Dundee executives and employees used deceptive and high-pressure
sales tactics to solicit investors.  In approximately August
2000, Oxford-Dundee became the subject of a civil investigation
conducted by the Connecticut Department of Banking.  Oxford-
Dundee ceased operations in approximately Summer 2001.

      7.    Coconspirator #1, a person whose identity is known
to the Grand Jury, resided at various times in Happauge and
Saint James, New York and was a friend of the defendant THOMAS W.
QUALLS.  Coconspirator #1 was also a principal of IFC and served
as its Vice President and Secretary.

8.    Between approximately 1993 and 1994, the defendant
THOMAS W. QUALLS, Coconspirator #1 and others were associated
with a chimney cleaning and repair company located in Bellmore,
New York.  During their association with this company, QUALLS,
Coconspirator #1 and others provided fraudulent estimates to
homeowners for chimney repair and maintenance, with the purpose
of defrauding such homeowners by performing unnecessary repairs
and maintenance.  In or about August 1994, Coconspirator #1,
among others, was convicted of the offense of Scheme to Defraud
in the Second Degree, in violation of New York Penal Law, for the
fraudulent conduct committed in the operation of the chimney
cleaning and repair company, a fact known to QUALLS prior to
2001.

9.    Coconspirator #2, a person whose identity is known
to the Grand Jury, was employed at Evergreen during the period of
approximately 1999 through September 2001.  Coconspirator #3, a
person whose identity is known to the Grand Jury, was employed at
Evergreen during the period of approximately October 1998 through
January 2000.

10.   In or about October 2001, the defendant THOMAS W.
QUALLS, Coconspirator #1, Coconspirator #2 and Coconspirator #3
met at QUALLS' home in Long Beach to discuss the opportunity for
Coconspirators #2 and #3 to join IFC's efforts to solicit
investors.  Coconspirators #2 and #3 agreed to join in such

5

efforts, and formed a separate entity, DYE Holding Corporation, to facilitate their involvement in the operations of IFC.

II. The Scheme to Defraud IFC's Investors

11. It was a part of the scheme to defraud that the defendant THOMAS W. QUALLS, Coconspirator #1, Coconspirator #2, Coconspirator #3 and others made and caused to be made written and oral false representations to investors in order to induce them to make investments with IFC.

12. For example, the defendant THOMAS W. QUALLS, Coconspirator #1, Coconspirator #2, Coconspirator #3 and others, including persons acting under the supervision of QUALLS and Coconspirator #2, caused documents touting IFC to be sent to investors, including but not limited to a brochure (the "Brochure"), a fact sheet (the "Fact Sheet"), and an introduction letter (the "Introduction Letter"). In connection with soliciting investors, IFC brokers used false written and oral representations that had been used previously at Evergreen and/or Oxford-Dundee.

A. False Statements and Representations Concerning the Experience, Expertise and Success of IFC and its Associates

13. It was a part of the scheme to defraud that the defendant THOMAS W. QUALLS, Coconspirator #1, Coconspirator #2, Coconspirator #3 and others made and caused to be made false written and oral representations concerning the experience,

6

expertise and success of IFC and its brokers.

14.   Among other false statements and representations, the Brochure sent to investors stated that IFC's brokers had "lengthy experience" in the foreign exchange market, that IFC's "traders have the expertise" to be successful, that IFC had a "knowledgeable, experienced, [and] courteous team of traders," that the "depth of [IFC's] traders' knowledge and breadth of their connections, positions [IFC's] traders advantageously in interacting with major houses," that IFC's "traders are astute at strategies that have been historically successful in generating profits," and that IFC's "experienced foreign exchange dealers employ fundamental and technical analysis."

15.   In fact, the defendant THOMAS W. QUALLS was IFC's only currency trader; QUALLS had limited experience in the field of currency trading; there were no "experienced foreign exchange dealers" employed at IFC; and IFC never dealt with "major houses" when trading, instead dealing with a single trading entity located in London, England (the "Trading Entity").

16.   The defendant THOMAS W. QUALLS and others, including IFC brokers acting under the supervision of QUALLS and Coconspirator #2, also made false oral representations to investors regarding the professional qualifications of IFC brokers, including claiming that such brokers possessed many years of experience in the foreign exchange market, that such

brokers were older than they were, that such brokers held senior
executive positions at IFC and that such brokers were the "top
producing broker" for IFC or the "top producing broker on Wall
Street." In fact, a number of IFC's brokers and cold callers
were approximately 20 to 25 years of age; had little or no
experience in the field of currency trading; did not actually
hold the executive titles they described; and were neither the
top producing broker at IFC nor on Wall Street.

17. Also in furtherance of the scheme to defraud, the
defendant THOMAS W. QUALLS and others, including brokers acting
under the supervision of QUALLS and Coconspirator #2, made false
oral representations to investors regarding the amount of
investor funds under the management of individual brokers,
including representations that one or more brokers had "millions"
of investor dollars under management. Moreover, documents
sent to investors stated that IFC had a "large fund" and
"provide[d] professional global services to the world's largest
investors."

18. In fact, IFC never had more than a total of
several hundred thousand dollars of investor funds under its
management at any one time; IFC's single largest investment was
in the amount of approximately $350,000; no single broker ever
had more than approximately $200,000 under management; IFC as a
whole had gross receipts of less than $1.5 million during the

8

course of its existence; and IFC never had any of the "world's largest investors" as a customer.

19. The defendant THOMAS W. QUALLS and others, including brokers acting under the supervision of QUALLS and Coconspirator #2, made other false representations to induce investments with IFC. These misrepresentations included, but were not limited to, the following:

(a) Coconspirator #4, an IFC broker, told Investor #1, a person whose identity is known to the Grand Jury, that the broker himself was conducting currency trading for Investor #1's account, and that the investor would receive an annual rate of return of 20 to 25 percent based on his trading. In fact, Coconspirator #4 never conducted any currency trading while at IFC;

(b) QUALLS told Investor #2, a person whose identity is known to the Grand Jury, that IFC "invested wisely," that QUALLS was a "very careful investor," that IFC "was better than the bank," and that IFC "had not really lost money" and "would not lose money." In fact, QUALLS had conducted losing currency trades prior to discussing IFC with Investor #2, and the results of the currency trading conducted by QUALLS over the course of the conspiracy were unprofitable;

(c) Coconspirator #5, another IFC broker, told investors that IFC was located in the vicinity of Wall Street in

9

Manhattan; in fact, IFC was located approximately 30 miles away from Wall Street, in Long Island;

(d)  in order to conceal his prior association with Evergreen, Coconspirator #2 told Investor #3, a person whose identity is known to the Grand Jury, that he had gained experience in currency trading as a result of working with a family member in this field for a number of years; in fact, Coconspirator #2's only exposure to currency trading prior to working at IFC was through his nearly three-year employment as a broker at Evergreen; and

(e)  Coconspirator #2 sometimes used a fictitious name when placing cold calls to investors, so that when he solicited these investors subsequently as a "broker" using his real name, Coconspirator #2 could attempt to convey the impression that he had more experience and status than a cold caller.

20.  It was a further part of the scheme to defraud that the defendant THOMAS W. QUALLS and others, including brokers acting under the supervision of QUALLS and Coconspirator #2, failed to inform investors of the commissions IFC paid to its brokers.  For example, investors were not informed that a broker who successfully solicited an investment was entitled to receive a commission equaling five to ten percent of such investment following its receipt by IFC.

B.    Account Statements and Purported Foreign Currency
      Trading

21.   It was a further part of the scheme to defraud
that the defendant THOMAS W. QUALLS, Coconspirator #1,
Coconspirator #2, Coconspirator #3 and others, including brokers
acting under the supervision of QUALLS and Coconspirator #2, made
and caused to be made false written and oral representations to
investors regarding the purported trading of investor funds in
the spot foreign exchange market.

22.   For example, the Brochure sent to investors stated
that IFC had a "highly knowledgeable network of analysts and
traders located in and around the world's financial markets" and
that IFC had relationships with "banks and institutions
overseas."   In fact, IFC did not have a network of analysts and
traders described in the Brochure; and the defendant THOMAS W.
QUALLS conducted a limited amount of currency trading exclusively
through the Trading Entity.

23.   It was also part of the scheme to defraud that the
Brochure sent to investors stated that "monthly statements keep
you informed" and that investors would "receive an activity
statement every month" showing "all activity in the account
during the month, including any cash movement and a monthly
account evaluation."   Similarly, the Introduction Letter sent to
investors stated that "[t]he certification that you receive for
all transactions are monthly statements sent by our clearing

agent, International Foreign Currency Inc.," and offered
investors the opportunity to receive account statements "[b]i-
weekly" or even "weekly." The defendant THOMAS W. QUALLS and
others, including brokers acting under the supervision of QUALLS
and Coconspirator #2, reinforced these false written
representations by making similar false oral representations to
investors.

    24.  In fact, IFC did not send out account statements
on a monthly basis, but did so irregularly. On occasion the
defendant THOMAS W. QUALLS would cause an account statement to be
sent to an investor only after the investor complained about not
having received one or more statements.

    25.  Also to further the scheme to defraud, the
defendant THOMAS W. QUALLS created account statements reflecting
currency trades purportedly conducted by IFC. In fact, some or
all of the account statements listed currency trading that never
occurred. For example:

    (a)  QUALLS caused one or more IFC investors to
receive, by mail and/or facsimile, account statements reflecting
currency trading purportedly occurring during the months August
through November 2002. In fact, no currency trading occurred in
IFC's account at the Trading Entity during this time period;

    (b)  on or about July 3, 2003, QUALLS caused Investor
#4, a person whose identity is known to the Grand Jury, to

receive, by mail and/or facsimile, an account statement that
reflected currency trading purportedly occurring on June 3, 2003.
In fact, no such currency trading occurred; all trading activity
in IFC's account at the Trading Entity ceased on or about April
22, 2003.

C.   Statements and Representations Concerning The Security
     of an IFC Investment

26.   It was a further part of the scheme to defraud
that the defendant THOMAS W. QUALLS, Coconspirator #1,
Coconspirator #2, Coconspirator #3 and others, including brokers
acting under the supervision of QUALLS and Coconspirator #2, made
and caused to be made false written and oral statements to
investors regarding the security of an investment with IFC.

27.   For example, the Introduction Letter sent to
investors stated that "all transactions made on your behalf are
done at Chase Manhattan Bank under the account of International
Foreign Currency, Inc., [w]hich insures your account with I.F.C.
up to twenty-five million USD."  Moreover, the defendant THOMAS
W. QUALLS and others, including brokers acting under the
supervision of QUALLS and Coconspirator #2, told investors that
their investment would be held in an individual account at Chase
and, later, at BONY, and that their investment served as
collateral for a line of credit established for trading purposes.

28.   In fact, IFC did not arrange for individual
investor accounts at Chase or BONY; no currency trading involving

IFC funds took place at Chase or BONY; a significant portion of IFC investor funds were sent abroad to an account maintained by the Trading Entity; and neither Chase, BONY nor IFC maintained insurance against an investor's trading losses in any amount.

29.   Also to further the scheme to defraud, the defendant THOMAS W. QUALLS and others, including brokers acting under the supervision of QUALLS and Coconspirator #2, falsely represented that IFC limited each investor's losses to ten percent of the investor's funds through a "stop loss."  In fact, no such limit on individual investor losses was ever in effect at IFC.

30.   It was also part of the scheme to defraud that the Brochure sent to investors stated that investor funds "cannot be commingled with the funds of the firm or of its principals."  In fact, the defendant THOMAS W. QUALLS and Coconspirator #1 used the Investor Account for personal cash withdrawals and expenditures unrelated to IFC's business; and to make payments for certain business expenses incurred by IFC.  For example:

(a)   between approximately November 2001 and July 2003, QUALLS withdrew at least $80,000 in cash, either by making automated teller machine ("ATM") withdrawals directly from the Investor Account with an IFC bank card; or by transferring funds from the Investor Account into an alternate account (the "Alternate Account") and then making ATM withdrawals from the

14

Alternate Account with an IFC bank card;

(b)    between approximately March 2002 and May 2003, QUALLS withdrew at least $43,000 by endorsing checks made out to "Cash" drawn on the Investor Account; by making bank teller withdrawals directly from the Investor Account; or by transferring funds from the Investor Account to the Alternate Account and then endorsing checks made out to "Cash" drawn on the Alternate Account;

(c)    between approximately November 2001 and July 2002, Coconspirator #1 withdrew approximately $10,000 in cash directly from the Investor Account by making ATM withdrawals using an IFC bank card;

(d)    between approximately March 2002 and July 2002, Coconspirator #1 withdrew at least $3,600 by endorsing checks made out to "Cash" drawn on the Investor Account, or by making bank teller withdrawals directly from the Investor Account;

(e)    between approximately July 2002 and November 2002, QUALLS used funds drawn on the Investor Account to make at least $6,800 in payments to a cruise line for a vacation cruise for his wife, brother and other family members;

(f)    between approximately January 2003 and May 2003, QUALLS used funds drawn on the Investor Account and the Alternate Account to give his brother approximately $9,500;

(g)    between approximately December 2002 and February

2003, QUALLS used funds drawn on the Investor Account to give his sister approximately $4,000;

(h)   between approximately December 2002 and April 2003, QUALLS used at least $5,300 in funds drawn on the Investor Account to make jewelry purchases;

(i)   between approximately February 2002 and November 2002, QUALLS used at least $3,000 in funds drawn on the Investor Account to pay for expenses incurred at Atlantic City casinos;

(j)   between approximately January 2002 and July 2003, QUALLS used at least $1,000 in funds drawn on the Investor Account to pay for adult entertainment and products;

(k)   on or about January 25, 2002, QUALLS used at least $700 in funds drawn on the Investor Account to pay for veterinary services for his dog;

(l)   between approximately January 2002 and January 2003, QUALLS used at least $100,000 in funds drawn on the Investor Account to pay the rent for the IFC Office; and

(m)   between approximately February 2002 and May 2003, QUALLS used at least $9,000 in funds drawn on the Investor Account to pay for automobile lease, rental and repair, as well as limousine and taxi services.

31.   It was a further part of the scheme to defraud that the Introduction Letter sent to investors stated that "[i]n the event a client is in need of funds, all that is required is a

written request faxed to I.F.C. with the dollar amount needed,
and to what wiring instructions the client desires us to send the
aforementioned monies" and that "[w]ithin twenty-four hours a
wire from the client's account at Chase Manhattan Bank, will be
sent to any destination the client instructs." The defendant
THOMAS W. QUALLS and others, including brokers acting under the
supervision of QUALLS and Coconspirator #2, reinforced this false
written representation by making similar false oral
representations to investors.

32.   In fact, QUALLS refused to return investors funds
on a number of occasions despite receiving written and verbal
demands from investors, or delayed returning such funds for weeks
or even longer.  When QUALLS caused funds to be returned, it was
sometimes for the purpose of maintaining a facade of legitimacy
for IFC, or to forestall an investor from contacting regulatory
or law enforcement authorities.  IFC failed to return hundreds of
thousands of dollars in investor funds even after it ceased
operations in 2003.

III. The Decline of IFC and Efforts by Qualls Obstruct and Impede
     Impede Federal Investigations and Proceedings

33.   Beginning in or about mid- to late 2002, IFC's
ability to attract and retain investor funds began to diminish
and funds in the Investor Account dwindled.  In order to maintain
and forestall discovery of the fraudulent scheme, the defendant
THOMAS W. QUALLS made and caused to be made false representations

to investors that, in sum and substance, affirmed that IFC would honor the investors' requests for return of their funds. QUALLS also caused his attorney to make false representations to investors concerning the availability of investor funds.

34. On or about June 23, 2003, Investor #5, a person whose identity is known to the Grand Jury, made a complaint to the United States Postal Inspection Service about IFC, and provided IFC-related documents to Postal Inspectors. One of these documents was a copy of the Introduction Letter that included the false representation, "All transactions made on your behalf are done at Chase Manhattan Bank under the account of International Foreign Currency Inc. [w]hich insures your account with I.F.C. up to twenty-five million USD," and which was signed under the name of Coconspirator #5.

35. In or about July 2003, an investigation was commenced by a Federal Grand Jury sitting in the Eastern District of New York concerning the conduct of IFC (the "Grand Jury Investigation"). In connection with the Grand Jury Investigation, on or about July 11, 2003, Postal Inspectors served a Grand Jury Subpoena on IFC at the IFC Office (the "Grand Jury Subpoena"). The Grand Jury Subpoena called for production of a wide range of documents pertaining to IFC's business and conduct, including all "customer files, customer account statements," "documents related to the trading in the Forex

currency markets," "wire transfer records" and "all documents
relating to IFC's $25 million dollar insurance agreement with
Chase."

        36.  Upon learning that Postal Inspectors had appeared
at the IFC Office that day, the defendant THOMAS W. QUALLS
traveled to the IFC Office and, after the Postal Inspectors had
departed, removed a number of boxes containing documents.  QUALLS
transported these documents to one or more other locations, and
subsequently concealed at least one box at his relative's home.
This box contained documents and records responsive to the Grand
Jury Subpoena, including customer agreements, customer account
statements, records of wire transfers, documents related to
trading in foreign currency markets, and copies of the
Introduction Letter containing the false representation that
Chase insured investor funds up to $25 million.

        37.  Also in or about July 2003, the Commodity Futures
Trading Commission ("CFTC") commenced an investigation of the
conduct of IFC (the "CFTC Investigation").  In connection with
the CFTC Investigation, on or about July 16, 2003, the CFTC
issued an administrative subpoena to IFC (the "CFTC Subpoena"),
which also sought a broad range of documents concerning IFC and
its operations, including customer lists, agreements and
documents, promotional materials, trading documentation,
correspondence and facsimiles, and communications between IFC and

Chase.

38.   On or about July 22, 2003, an attorney representing IFC and the defendant THOMAS W. QUALLS produced certain documents to Postal Inspectors in response to the Grand Jury Subpoena.   The production did not contain any copies of the Introduction Letter; moreover, the attorney stated, in a letter to Postal Inspectors accompanying the production, that "IFC is not aware of any insurance agreement with Chase Manhattan Bank."

39.   On or about July 23, 2003, in connection with its investigation, the CFTC commenced a civil action in the United States District Court for the Eastern District of New York against IFC, the defendant THOMAS W. QUALLS and Coconspirator #5, alleging fraudulent conduct occurring at IFC and seeking injunctive and other relief, Commodity Futures Trading Commission v. International Foreign Currency, Inc., et al., Civ. No. 03-3577 (DLI) (the "CFTC Action").

40.   On or about August 6, 2003, in connection with the CFTC Action, counsel for the CFTC conducted a sworn deposition of the defendant THOMAS W. QUALLS at the United States District Court for the Eastern District of New York located in Central Islip, New York.   During that deposition QUALLS testified falsely in order to impede and obstruct both the Grand Jury Investigation and CFTC Investigation (together the "Federal Investigations"), as well as the CFTC Action.   QUALLS' false testimony included,

but was not limited to, the following:

(a)   during the deposition, QUALLS was shown a copy of the Introduction Letter provided by Investor #5, which contained the false representation that Chase insured investor funds up to $25 million.  When QUALLS was asked whether he knew how Coconspirator #5 obtained this letter, QUALLS testified falsely when stating in response, "I couldn't tell you, but it certainly didn't come from me" and "this is not my paperwork."  In fact, QUALLS knew of the existence of the Introduction Letter and approved its distribution to IFC investors; and

(b)   QUALLS was asked during this deposition, "what were IFC's credit cards used for, what type of expenses?"  QUALLS testified falsely by stating in response, "business expenses," and then providing as examples "office supplies, any type of printers, computer equipment.  They were used for hotels for clients, dinners, any various business meetings, any business travel."  QUALLS failed to disclose numerous personal expenses and cash withdrawals he and Coconspirator #1 charged to the Investor Account with IFC bank cards, including the expenses and withdrawals described in subparagraphs 30(a)-(k) above.

41.   On or about August 11, 2003, the attorney representing IFC and the defendant THOMAS W. QUALLS produced additional documents to Postal Inspectors in response to the Grand Jury Subpoena.  This production also failed to include any

copies of the Introduction Letter. Moreover, the attorney
falsely stated, in a letter to Postal Inspectors accompanying
this production, that "The '25 million dollar' document never
existed."

42.   On or about August 28, 2003, the attorney
representing IFC and the defendant THOMAS W. QUALLS produced
documents to the CFTC in response to the CFTC Subpoena.  This
production again failed to include any copies of the Introduction
Letter.  Moreover, QUALLS never produced to either the Grand Jury
or the CFTC those documents and records contained in the box
concealed at the home of QUALLS' relative, despite the fact that
most if not all of these documents and records were responsive to
both the Grand Jury and CFTC Subpoenas.

COUNT ONE
(Conspiracy to Commit Mail and Wire Fraud)

43.   Paragraphs 1 through 42 are hereby realleged and
incorporated as though fully set forth in this paragraph.

44.   In or about and between May 2001 and August 2003,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendant THOMAS W.
QUALLS, together with others, did knowingly and intentionally
conspire to devise a scheme and artifice to defraud IFC's
investors, and to obtain money and property from such investors,
by means of materially false and fraudulent pretenses,
representations and promises, and for the purpose of executing

such scheme and artifice, and attempting to do so, to (a) place and cause to be placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the United States Postal Service, and deposit matters and things to be sent and delivered by commercial foreign and interstate carriers, in violation of Title 18, United States Code, Section 1341, and (b) cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Mail Fraud)

45.   Paragraphs 1 through 42 are hereby realleged and incorporated as though fully set forth in this paragraph.

46.   In or about and between May 2001 and August 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant THOMAS W. QUALLS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud IFC's investors, and to obtain money and property from such investors, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, did place and cause to be

placed in a post office or authorized depository for mail matter, matters and things to be sent and delivered by the United States Postal Service, and deposit matters and things to be sent and delivered by commercial foreign and interstate carriers, to wit: (a) brochures, correspondence, customer agreements, account statements and other documents sent to or from IFC investors or potential investors, (b) bank statements and other bank records concerning IFC and DYE Holding Corporation, and (c) documents sent to the Trading Entity in England.

(Title 18, United States Code, Sections 1341, 2 and 3551 et seq.)

## COUNTS THREE THROUGH EIGHTEEN
### (Wire Fraud)

47.    Paragraphs 1 through 42 are hereby realleged and incorporated as though fully set forth in this paragraph.

48.    In or about and between May 2001 and August 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant THOMAS W. QUALLS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud IFC's investors, and to obtain money and property from such investors, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, did transmit and cause to be transmitted writings, signs, signals, pictures and sounds by

means of wire communication in interstate and foreign commerce,

as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|---|
| 3 | 11/6/2001 | Facsimile transmission from Coconspirator #2 sent to Investor #3 in Norway |
| 4 | 2/12/2002 | Facsimile transmission from Coconspirator #2 sent from IFC Office to Investor #3 in Norway |
| 5 | 3/7/2002 | Facsimile transmission from the IFC Office to Investor #5 in Australia |
| 6 | 4/19/2002 | Facsimile transmission from Coconspirator #2 sent from the IFC Office to Investor #3 in Norway |
| 7 | 5/23/2002 | Facsimile transmission from the IFC Office to Investor #6, a person whose identity is known to the Grand Jury, in Scotland |
| 8 | 6/3/2002 | Facsimile transmission from QUALLS sent from the IFC Office to Investor #3 in Norway |
| 9 | 6/17/2002 | Facsimile transmission from the IFC Office to Investor #6 in Scotland |
| 10 | 6/20/2002 | Facsimile transmission from the IFC Office to Investor #1 in Belgium |
| 11 | 7/18/2002 | Facsimile transmission from the IFC Office to Investor #5 in Australia |

| 12 | 8/27/2002 | Facsimile transmission from the IFC Office to Investor #1 in Belgium |
| 13 | 10/23/2002 | Facsimile transmission from the IFC Office to Investor #4 in Colorado |
| 14 | 1/24/2003 | Facsimile transmission from the IFC Office to Investor #5 in Australia |
| 15 | 1/24/2003 | Facsimile transmission from the IFC Office to Investor #4 in Colorado |
| 16 | 1/30/2003 | Facsimile transmission from QUALLS sent from the IFC Office to Investor #1 in Belgium |
| 17 | 3/4/2003 | Facsimile transmission from the IFC Office to Investor #4 in Colorado |
| 18 | 7/3/2003 | Facsimile transmission from QUALLS sent from the IFC Office to Investor #4 in Colorado |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNT NINETEEN
### (Money Laundering Conspiracy)

49.   The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

50.   In or about and between May 2001 and August 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant THOMAS W. QUALLS, together with others, did knowingly and intentionally

conspire to (a) conduct and attempt to conduct financial

transactions affecting interstate commerce which in fact involved

the proceeds of specified unlawful activity, to wit: mail and

wire fraud, in violation of Title 18, United States Code,

Sections 1341 and 1343, knowing that the property involved in

such financial transactions represented the proceeds of some form

of unlawful activity, with the intent to promote the carrying on

of specified unlawful activity, all in violation of Title 18,

United States Code, Section 1956(a)(1)(A)(i), (b) transport,

transmit and transfer monetary instruments and funds from a place

in the United States to places outside the United States, to wit:

Belgium, England, Norway and Scotland, knowing that the funds

involved in the transportation, transmission and transfer

represented the proceeds of some form of unlawful activity, with

the intent to promote the carrying on of specified unlawful

activity, to wit: mail and wire fraud, in violation of Title 18,

United States Code, Sections 1341 and 1343, all in violation of

Title 18, United States Code, Section 1956(a)(2)(A), and (c)

engage and attempt to engage in monetary transactions in and

affecting interstate commerce, in criminally derived property

that was of a value greater than $10,000 and that was derived

from specified unlawful activity, to wit: mail and wire fraud, in

violation of Title 18, United States Code, Sections 1341 and

1343, knowing that the property involved in such monetary

transactions represented the proceeds of some form of unlawful
activity, all in violation of Title 18, United States Code,
Section 1957(a), 1957(b).

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

### COUNT TWENTY
(Money Laundering)

51.   The allegations contained in paragraphs 1 through
42 are realleged and incorporated as if fully set forth in this
paragraph.

52.   In or about and between May 2001 and August 2003,
within the Eastern District of New York and elsewhere, the
defendant THOMAS W. QUALLS, together with others, knowing that
the property involved in financial transactions represented the
proceeds of some form of unlawful activity, did knowingly and
intentionally conduct and attempt to conduct financial
transactions affecting interstate and foreign commerce, which in
fact involved the proceeds of specified unlawful activity, to
wit: mail and wire fraud, in violation of Title 18, United States
Code, Sections 1341 and 1343, with the intent to promote the
carrying on of specified unlawful activity.

(Title 18, United States Code, Sections
1956(a)(1)(A)(i), 2 and 3551 et seq.)

COUNT TWENTY-ONE
(Money Laundering)

53.   The allegations contained in paragraphs 1 through
42 are realleged and incorporated as if fully set forth in this
paragraph.

54.   In or about and between May 2001 and August 2003,
within the Eastern District of New York and elsewhere, the
defendant THOMAS W. QUALLS, together with others, did knowingly
and intentionally transport, transmit and transfer monetary
instruments and funds from a place in the United States to places
outside the United States, to wit: Belgium, England, Norway and
Scotland, knowing that the funds involved in the transportation,
transmission and transfer represented the proceeds of some form
of unlawful activity, with the intent to promote the carrying on
of specified unlawful activity, to wit: mail and wire fraud, in
violation of Title 18, United States Code, Sections 1341 and
1343.

(Title 18, United States Code, Sections 1956(a)(2)(A),
2 and 3551 et seq.)

COUNT TWENTY-TWO
(Engaging in Unlawful Monetary Transactions)

55.   The allegations contained in paragraphs 1 through
42 are realleged and incorporated as if fully set forth in this
paragraph.

56.   In or about and between May 2001 and August 2003,

within the Eastern District of New York and elsewhere, the
defendant THOMAS W. QUALLS, together with others, did knowingly
and intentionally engage and attempt to engage in monetary
transactions, in and affecting interstate and foreign commerce,
in criminally derived property that was of a value greater than
$10,000 and that was derived from specified unlawful activity, to
wit: mail and wire fraud, knowing that the property involved in
such monetary transactions represented the proceeds of some form
of unlawful activity.

(Title 18, United States Code, Sections 1957(a),
1957(b), 2 and 3551 et seq.)

## COUNT TWENTY-THREE
(Obstruction of Justice)

57.   The allegations contained in paragraphs 1 through
42 are realleged and incorporated as if fully set forth in this
paragraph.

58.   In or about and between July 2003 and December
2004, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant THOMAS
W. QUALLS, together with others, did knowingly, intentionally and
corruptly conceal, and attempt to conceal, records, documents and
other objects with the intent to impair the availability of such

records, documents and objects for use in official proceedings, to wit: the Federal Investigations and CFTC Action.

(Title 18, United States Code, Sections 1512(c)(1), 2 and 3551 et seq.)

## COUNT TWENTY-FOUR.
### (Obstruction of Justice)

59.   The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

60.   In or about and between July 2003 and December 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant THOMAS W. QUALLS, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, official proceedings, to wit: the Federal Investigations and CFTC Action.

(Title 18, United States Code, Sections 1512(c)(2), 2 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION
### FOR COUNTS ONE THROUGH EIGHTEEN
### (Conspiracy to Commit Mail and Wire Fraud;
### Mail Fraud; Wire Fraud)

61.   The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

62.   The United States hereby gives notice to the

defendant THOMAS W. QUALLS that, upon his conviction of any of
Counts One through Eighteen, the government will seek forfeiture
in accordance with Title 18, United States Code, Section
981(a)(1)(C) and Title 28, United States Code, Section 2461(c),
which require any person convicted of such offenses to forfeit
any property constituting or derived from proceeds obtained
directly or indirectly as a result of such offenses.

      63. If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

      (a) cannot be located upon the exercise of due
          diligence;

      (b) has been transferred or sold to, or deposited
          with, a third party;

      (c) has been placed beyond the jurisdiction of the
          Court;

      (d) has been substantially diminished in value; or

      (e) has been commingled with other property which
          cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), as incorporated by Title 28,
United States Code, Section 2461(c), to seek forfeiture of any
other property of such defendant up to the value of the
forfeitable property described in this forfeiture allegation.

      (Title 28, United States Code, Section 2461(c); Title
18, United States Code, Section 981(a)(1)(C); Title 21, United
States Code, Section 853)

CRIMINAL FORFEITURE ALLEGATION
FOR COUNTS NINETEEN THROUGH TWENTY-TWO
(Money Laundering Conspiracy; Money Laundering;
Engaging in Unlawful Monetary Transactions)

64.   The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

65.   The United States hereby gives notice to the defendant THOMAS W. QUALLS that, upon his conviction of any of Counts Nineteen through Twenty-Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982, of all property involved in each offense of conviction in violation of Title 18, United States Code, Sections 1956 and 1957, or conspiracy to commit such offenses, and all property traceable to such property.

64.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third party;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18,

United States Code, Section 982(b), to seek forfeiture of any
other property of such defendant up to the value of the
forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 982; Title 21,
United States Code, Section 853)

A TRUE BILL

_____
FOREPERSON

_____
ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F#2006R02221                    **INFORMATION SHEET**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1.    Title of Case:    United States v. Thomas Qualls

2.    Related Magistrate Docket Number(s)        N/A


        None ( )

3.    Arrest Date:

4.    Nature of offense(s):   X       Felony
                             ☐       Misdemeanor

5.    Related Civil or Criminal Cases - Title and Docket No(s). (Pursuant to Rule 50.3 of the
      Local E.D.N.Y. Division of Business Rules):    Commodity Futures Trading
      Commission v. International Foreign Currency, et al., Civ. No. 03-3577 (DLI) – The
      Honorable Dora L. Irizarry

6.    Projected Length of Trial:    Less than 6 weeks      (X)
                                    More than 6 weeks      ( )

7.    County in which crime was allegedly committed:    Kings (related per Rule 50.3(c))
      (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.    Has this indictment been ordered sealed?             ( X ) Yes  ( ) No

9.    Have arrest warrants been ordered?                   ( X ) Yes  ( ) No

10.   Is a capital count included in the indictment?       ( ) Yes  (X) No

                                          ROSLYNN R. MAUSKOPF
                                          UNITED STATES ATTORNEY

                                   By:    _____

                                          Matthew Levine
                                          Assistant U.S. Attorney
                                          (718) 254-6294

Rev. 10/01/03